In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00020-CV
______________________________


JOHNNY YOUNGBLOOD AND CAROL YOUNGBLOOD, Appellants
Â 
V.
Â 
U.S. SILICA COMPANY, THE FELDSPAR CORPORATION,
AND UNIMIN CORPORATION, Appellees


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 98-1743-B


Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Ross


O P I N I O N

Â Â Â Â Â Â Â Â Â Â We withdraw our opinion of December 18, 2003, overrule the appellees' motion for
rehearing, and substitute the following opinion.
Â Â Â Â Â Â Â Â Â Â Near the end of his forty years of employment with Kilgore Ceramics,


 Johnny
Youngblood developed respiratory problems. He eventually retired and learned his
breathing difficulties were caused by the work-related illness, "silicosis."


 Youngblood sued
his former employer and a number of silica manufacturers for his injuries. Three of those
defendants, U.S. Silica Company, The Feldspar Corporation, and Unimin Corporation
(collectively "U.S. Silica"), successfully moved for summary judgment in the trial court, from
which Youngblood now appeals.


 We reverse the judgment.
Standard of Review
Â Â Â Â Â Â Â Â Â Â To prevail on a motion for summary judgment, the moving party must establish that
no genuine issue of material fact exists and that it is entitled to judgment as a matter of
law. Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471 (Tex. 1991). When reviewing the
trial court's grant of a summary judgment, the appellate court must examine the evidence
in the light most favorable to the nonmovant, disregarding all contrary evidence and
inferences. Nixon v. Mr. Prop. Mgmt., Inc., 690 S.W.2d 546, 548-49 (Tex. 1985). A trial
court errs by granting a defendant's traditional motion for summary judgment if the
defendant fails to demonstrate that at least one element of the plaintiff's case has been
conclusively negated or fails to demonstrate that the defendant is entitled to judgment as
a matter of law. Amouri v. Southwest Toyota, Inc., 20 S.W.3d 165, 168 (Tex.
App.âTexarkana 2000, pet. denied). "In deciding if the defendant has met its burden, we
indulge every reasonable inference from the evidence and resolve all doubts in favor of the
nonmovant." Id. (citing Montgomery v. Kennedy, 669 S.W.2d 309, 311 (Tex. 1984)); see
also Nixon, 690 S.W.2d at 548-49.
Â Â Â Â Â Â Â Â Â Â Â U.S. Silica moved for summary judgment based on Youngblood's alleged failure
to file suit within the applicable statute of limitations. "A defendant who moves for
summary judgment based upon limitations bears the burden of negating the discovery rule
at the summary judgment stage." Nugent v. Pilgrim's Pride Corp., 30 S.W.3d 562, 567
(Tex. App.âTexarkana 2000, pet. denied). The discovery rule is an exception to the
statute of limitations. As this Court recently stated, the discovery rule
defers the accrual of a cause of action until the plaintiff knew, or through the
exercise of reasonable diligence should have known, of the facts giving rise
to the cause of action. Trinity River Auth. v. URS Consultants, Inc., 889
S.W.2d 259, 262 (Tex. 1994); Moreno, 787 S.W.2d at 351. The discovery
rule therefore delays the commencement of the limitations period when the
nature of the injury is inherently undiscoverable and evidence of the injury is
objectively verifiable. See Computer Assocs. Int'l, Inc. v. Altai, Inc., 918
S.W.2d 453, 456 (Tex. 1996); Tanglewood Terrace, Ltd. v. City of
Texarkana, 996 S.W.2d 330, 337 (Tex. App.âTexarkana 1999, no pet.). 
These two elements of inherent undiscoverability and objective verifiability
balance these conflicting policies in statutes of limitations: the benefits of
precluding stale claims versus the risks of precluding meritorious claims that
happen to fall outside an arbitrarily set period. S.V. v. R.V., 933 S.W.2d 1,
6 (Tex. 1996). An injury is inherently undiscoverable if it is the type of injury
that is not generally discoverable by the exercise of reasonable diligence. 
See HECI Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998), citing
Altai, 918 S.W.2d at 455. In order for an injury to be inherently
undiscoverable, the injury need not be absolutely impossible to discover. 
S.V., 933 S.W.2d at 7. The discovery of a particular injury depends on the
circumstances of the injury and the plaintiff's diligence.
Â 
Haas v. George, 71 S.W.3d 904, 912 (Tex. App.âTexarkana 2002, no pet.). Regarding
the discovery rule and the tolling of the statute of limitations in occupational disease cases,
the Texas Supreme Court has also stated, 
a cause of action accrues whenever a plaintiff's symptoms manifest
themselves to a degree or for a duration that would put a reasonable person
on notice that he or she suffers from some injury and he or she knows, or in
the exercise of reasonable diligence should have known, that the injury is
likely work-related.
Â 
Childs v. Haussecker, 974 S.W.2d 31, 33 (Tex. 1998) (emphasis added).

Background Facts
Â Â Â Â Â Â Â Â Â Â The evidence, viewed in the light most favorable to Youngblood, showed the
following: Youngblood worked at Kilgore Ceramics from 1959 until his retirement in 1999. 
There was testimony from several sources that Youngblood worked around silica and that
(for at least some portion of his employment) he worked in an area in which he was also
exposed to asbestos. Youngblood testified he retired because he was no longer able to
work due to breathing problems and a continuous cough that was eventually accompanied
by excessive phlegm production. According to Youngblood, it was not until December
1997 that he learned he had silicosis. 
Â Â Â Â Â Â Â Â Â Â During his deposition, Youngblood acknowledged that Kilgore Ceramics required
employees to have their chests x-rayed on being hired, and thereafter all employees were
x-rayed every two or three years. The record before us shows Youngblood was x-rayed
on a periodic basis consistent with this policy. Youngblood also admitted he began
experiencing respiratory problems in the late 1980s, though he did not assume his
condition was work related. 
Â Â Â Â Â Â Â Â Â Â In a letter dated March 17, 1992, Allan Goldstein, M.D., the medical director of the
organization that performed a chest x-ray test for Youngblood at his place of employment,
informed Youngblood his x-ray results were such "that we recommend you consult your
physician for further evaluations." The letter, however, did not suggest a medical
diagnosis. As a result of Goldstein's letter, Youngblood went to see Gail Stockman, M.D.,
in Longview. At the time of his deposition in this case, Youngblood could not recall what
Stockman told him regarding his tests at her office. Youngblood, however, denied being
told by Stockman in 1992 that he had silicosis. 
Â Â Â Â Â Â Â Â Â Â In 1997, doctors again thought Youngblood's employer-sponsored x-ray appeared
abnormal. The company physician suggested Youngblood see his personal physician for
further evaluation. That letter, like the one Youngblood received in 1992, did not suggest
he had silicosis. According to Youngblood, he was not told he had silicosis and asbestosis
until he later saw Peter Petroff, M.D., of Independent Medical Associates, a company hired
at that time by his employer to review its workers' x-ray results. 
Â Â Â Â Â Â Â Â Â Â On August 28, 1998, Youngblood sued a number of defendants, including U.S.
Silica, claiming each was liable for contributing to his contracting the disease conglomerate
silicosis, a disease he claims resulted from his use of the defendants' products during his
employment at Kilgore Ceramics. The trial court ultimately granted summary judgment in
favor of U.S. Silica. On appeal, Youngblood contends genuine issues of material fact exist
as to whether he knew, or should have known, more than two years before the date he
filed the lawsuit that his injuries were work related. 
U.S. Silica's Contentions
Â Â Â Â Â Â Â Â Â Â "Except as provided by Sections 16.010 and 16.0045, a person must bring suit for
. . . personal injury . . . not later than two years after the day the cause of action accrues." 
Tex. Civ. Prac. & Rem. Code Ann. Â§ 16.003(a) (Vernon 2002). U.S. Silica alleged
Youngblood either received his silicosis diagnosis in 1985 or 1992 or, alternatively, he
should have known before 1996 that his respiratory problems were work related and that,
by waiting until 1998 to file suit, Youngblood's cause of action was barred by the two-year
statute of limitations. 
Â Â Â Â Â Â Â Â Â Â In defense of the trial court's award of summary judgment, U.S. Silica contends a
reasonable person with Youngblood's specific health problems (continuous coughing and
shortness of breath), and in his line of work (being continuously exposed to silica), would
have been on notice that he or she suffers from some injury and, using due diligence,
would have either known, or should have reasonably concluded, that those symptoms were
caused by work-related exposure to silica. Then, citing Zacharie v. U.S. Natural Res., Inc.,
94 S.W.3d 748, 753 (Tex. App.âSan Antonio 2002, no pet.), U.S. Silica contends a
singular, definitive, medical diagnosis is not required for the worker to be placed on notice
of a work-related injury; "[a] differential diagnosis is sufficient." U.S. Silica then argues (1)
Youngblood does not dispute he knew he had a lung disease before AugustÂ 28, 1996; and
(2) Youngblood should have concluded his lung disease was work related before August
28, 1996, because (a) Youngblood's employer had a policy of having employees receive
chest x-rays on a regular basis, the clear purpose of which was to screen workers for
occupational lung diseases, (b) Stockman's unobjected-to affidavit establishes she made
a differential diagnosis of either silicosis or tuberculosis in 1992, (c)Â Randy Erwin, M.D.,
recommended entering a differential diagnosis of old tuberculosis or other granulomatous
disease, including fungal disease, sarcoidosis, or silicosis on MayÂ 16, 1995, (d) Dale
Fisher, M.D., had recommended entry of a differential diagnosis of silicosis, old
tuberculosis, fungal disease, or sarcoidosis in 1998, and (e) Youngblood reportedly
admitted to Andy Abril, M.D., in February 2001 that he had been diagnosed with silicosis
about six or seven years earlier. 
Â Â Â Â Â Â Â Â Â Â U.S. Silica also contends the affidavits submitted by Johnny and Carol Youngblood
in response to its motion for summary judgment (and tendered before the summary
judgment hearing) were substantively defective and therefore could not serve as evidence
that may be considered in whether the trial court properly granted summary judgment. 
U.S. Silica further asserts that the Youngbloods' amended affidavits, though filed with leave
of the trial court, were submitted well after the entry of summary judgment and therefore
had no evidentiary effect. 
Youngblood's Contentions
Â Â Â Â Â Â Â Â Â Â Youngblood counters by referencing his summary judgment affidavit in which he
stated (1) he neither knew, nor could have known, he had silicosis before December 1997
when he was notified by Petroff he had silicosis, and (2) he was never informed of Erwin's
1995 recommendation of a differential diagnosis that included silicosis, nor did he ever say
to Abril that he had silicosis. Then, comparing his appeal with the case reviewed by the
Texas Supreme Court in Childs, 974 S.W.2d 31, Youngblood contends the doctors'
continual failure to diagnose his illness, when combined with Youngblood's own testimony
denying knowledge of the work related injuries before 1997, presents more than a scintilla
of evidence of a material fact, thereby precluding summary judgment. 
Â Â Â Â Â Â Â Â Â Â Youngblood also asserts that the affidavits he submitted in response to U.S. Silica's
motion for summary judgment may be considered in reviewing the trial court's decision. 
Youngblood contends U.S. Silica failed to obtain a ruling on its objections to the affidavits
before or during the trial court's summary judgment hearing. Therefore, according to
Youngblood, U.S. Silica waived its objections to those affidavits, thereby permitting our
consideration of those affidavits as substantive evidence that precludes summary
judgment. 
Analysis
Â Â Â Â Â Â Â Â Â Â The relevant material fact at issue on appeal is whether Youngblood actually knew,
or should have known before 1996, that his injuries were work related. If the answer to
either question is "yes," then the trial court properly granted summary judgment. Only if
the answer to both questions is "no" should we find the trial court abused its discretion.
A. The Youngbloods' Affidavits
Â Â Â Â Â Â Â Â Â Â After U.S. Silica filed its motion for summary judgment, Youngblood filed a lengthy
response. His response included affidavits from himself and his wife, Carol. On July 30,
2002, at 9:38 a.m., U.S. Silica filed nine pages of objections to the Youngbloods'
affidavits.


 At 11:05 a.m. that same day, the trial court granted U.S. Silica's motion for
summary judgment. The trial court did not rule on U.S. Silica's objections to the
Youngbloods' affidavits until August 7, 2002, when the trial court signed an order sustaining
U.S. Silica's objections on the basis that the affidavits did not affirmatively state that the
facts contained therein were true and within the personal knowledge of each affiant. The
trial court, however, attempted to vacate this order October 15, 2002. Also on October 15,
the trial court granted Youngblood's motion for leave to file amended affidavits. These
amended affidavits of Johnny and Carol Youngblood are identical to the original affidavits,
except that the amended affidavits were notarized July 30 and contain the additional
paragraph, "The facts stated in this affidavit are true and correct and within my personnel
[sic] knowledge." 
Â Â Â Â Â Â Â Â Â Â Affidavits submitted to a trial court in opposition to a motion for summary judgment
must be made on personal knowledge. Tex. R. Civ. P. 166a(f). In its brief to this Court,
U.S. Silica cites Landscape Design & Constr., Inc. v. Warren, 566 S.W.2d 66, 67 (Tex. Civ.
App.âDallas 1978, no writ), for the proposition that an affidavit's failure to affirmatively
state it is based on personal knowledge amounts to a defect of substance and, therefore,
the Youngbloods' affidavits are legally insufficient to defeat U.S. Silica's motion for
summary judgment. 
Â Â Â Â Â Â Â Â Â Â In Warren, an attorney submitted an affidavit that was based on information he had
garnered from the client rather than his own first-hand knowledge. Id. The court of
appeals reversed the trial court's award of summary judgment because the attorney's
affidavit did not recite facts from which his personal knowledge could be inferred. Id. 
Thus, Warren does not stand for the general proposition that all affidavits that fail to state
affirmatively they are based on personal knowledge are thereby inherently and
substantively rendered insufficient. Instead, Warren reflects a two-step analysis: First,
does the affidavit affirmatively state it is based on personal knowledge by someone
competent to testify to the matters contained therein? If so, then the affidavit may be
considered as evidence. If not, then the trial court should secondly review the entire
affidavit and determine whether the affiant is testifying from personal knowledge and is
competent to give such testimony. If the answer to this latter question is "yes," then the
affidavit has a defect of form, and the trial court should provide the offending party an
opportunity to cure the defect. Id.; see Tex. R. Civ. P. 166a(f). If the answer to the second
question is "no," as it was in Warren, or if the party refuses to correct the defect of form,
only then should the trial court disregard the affidavit's contents to determine whether the
remaining evidence supports or defeats summary judgment.


 Tex. R. Civ. P. 166a(f)."Defects in the form of affidavits or attachments will not be grounds for reversal unless
specifically pointed out by objection by an opposing party with opportunity, but refusal, to
amend." Id. 
Â Â Â Â Â Â Â Â Â Â In this case, the Youngblood affidavits submitted before the summary judgment
hearing lack the phrase, "The facts in this affidavit are true and correct and within my
personnel [sic] knowledge." The Texas Supreme Court has held that, if it is clear from
reading an entire affidavit that an affiant is testifying from personal knowledge and is
competent to testify regarding the matters so stated, the affidavit's failure to invoke the
"personal knowledge" language is a mere defect of form. Grand Prairie Indep. Sch. Dist.
v. Vaughan, 792 S.W.2d 944, 945 (Tex. 1990); see also Grotjohn Precise Connexiones
Int'l v. JEM Fin., Inc., 12 S.W.3d 859, 866 (Tex. App.âTexarkana 2000, no pet.). If a party
fails to object to a defect in the form of an affidavit, or fails to secure an adverse ruling on
such an objection, then any objection to the affidavit for a defect in form is waived. 
Vaughan, 792 S.W.2d at 945 (citing former Tex. R. Civ. P. 166a(e) (Vernon 1990), now
Tex. R. Civ. P. 166a(f)); Grotjohn Precise Connexiones Int'l, 12 S.W.3d at 866. The ruling
on an objection to an affidavit's form must be obtained at or before the trial court hears the
summary judgment motion. McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337,
343 n.7 (Tex. 1993).
Â Â Â Â Â Â Â Â Â Â We have reviewed the entirety of the Youngblood affidavits submitted before the
summary judgment hearing. Johnny's affidavit discusses his initial visit with Stockman, the
process of undergoing a bronchoscopy, and his conversations with Stockman, among
other things. His affidavit is clearly based on personal knowledge. Cf. Vaughan, 792
S.W.2d at 945. Similarly, Carol's affidavit leads us to conclude that it, too, is based on her
personal knowledge of the matters therein stated. We find the Youngbloods' failure to
affirmatively state their affidavits were based on personal knowledge amounts to a defect
of form, not of substance. As U.S. Silica did not, until well after the summary judgment
hearing, obtain rulings on its objections to the form of the Youngbloods' affidavits, those
objections have been waived. 
Â Â Â Â Â Â Â Â Â Â U.S. Silica, however, further argues the Youngbloods' affidavits are merely a sham
and, therefore, incompetent evidence. 
If a party's own affidavit contradicts earlier testimony, the affidavit must
explain the reason for the change. Farroux v. Denny's Rests., Inc., 962
S.W.2d 108, 111 (Tex. App.âHouston [1st Dist.] 1997, no pet.). Without an
explanation, it is assumed that the sole purpose of the affidavit was to avoid
summary judgment, and as such, the affidavit merely presents a "sham" fact
issue. Id. 

Burkett v. Welborn, 42 S.W.3d 282, 286 (Tex. App.âTexarkana 2001, no pet.). "[A]n
attempt to create a 'sham' fact issue . . . will not defeat a motion for summary judgment. 
Cantu v. Peacher, 53 S.W.3d 5, 7 (Tex. App.âSan Antonio 2001, pet. denied).
Â Â Â Â Â Â Â Â Â Â U.S. Silica correctly points out that, during his deposition, Youngblood testified he
could not remember his prior conversations with Stockman.
Â Â Â Â Â Â Â Â Â Â Q And what do you recall Dr. Stockman telling you?
Â 
Â Â Â Â Â Â Â Â Â Â A I can't remember . . . .
Â 
In his affidavit submitted in response to U.S. Silica's motion for summary judgment,
however, Youngblood testified,
[In 1992,] Dr. Stockman could not provide me with an explanation as to what
caused the abnormal chest x-ray and that annual treatment and a
subsequent bronchoscopy by another physician was recommended. At no
time, [punctuation sic] did Dr. Stockman inform me that I had an occupational
lung disease or silicosis. In fact, Dr. Stockman told me I could return to work
. . . and carry out my duties as a tank-caster.
Â 
U.S. Silica contends Youngblood's sudden and unexplained ability to remember his 1992
conversation with Stockman (as recorded in Youngblood's summary judgment affidavit)
directly conflicts with his deposition testimony. U.S. Silica then asserts "[b]ecause this
aspect of Mr.Â Youngblood's affidavit contradicts his prior deposition, without any
reasonable explanation, it fails to constitute probative summary judgment evidence, as a
matter of law." 
Â Â Â Â Â Â Â Â Â Â Looking at both statements in a vacuum, it would be easy for us to agree with U.S.
Silica's position. We cannot, however, examine mere fragments of a deposition. We are
required to examine the deposition testimony in the context of the entire deposition to
determine if, in context, the deposition and the affidavit are not apposite so as to raise a
fact issue that would preclude summary judgment. See Nixon, 690 S.W.2d at 548-49
(requiring (2) all evidence favorable to the nonmovant to be taken as true regarding a
disputed fact issue precluding summary judgment, and (3) every reasonable inference
indulged in favor of nonmovant).
Â Â Â Â Â Â Â Â Â Â We believe Youngblood's affidavit is congruous with his deposition testimony. On
the page following his above-cited testimony, the following exchange occurred:
Â Â Â Â Â Â Â Â Â Â Q Other than this occasion in 1992 when Dr. Goldstein told you [sic]
needed to have your X rays evaluated or to consult with your physician for
further evaluation, do you recall any other times when you were told that your
X ray was abnormal?
Â 
Â Â Â Â Â Â Â Â Â Â A In '97 when they said that it was silicosis and asbestos.
Â 
Â Â Â Â Â Â Â Â Â Â Q Is that the first time that anyone told you you had silicosis --
Â 
Â Â Â Â Â Â Â Â Â Â A Yes, sir.
Â 
Â Â Â Â Â Â Â Â Â Â Q -- or asbestos?
Â 
Â Â Â Â Â Â Â Â Â Â A Yes, sir. They just told me before that it was abnormal.
Â 
Â Â Â Â Â Â Â Â Â Â In light of the entirety of Youngblood's deposition testimony, we must conclude his
summary judgment affidavit is harmonious with his deposition testimony. The thrust of
both is the same: no one told him he had silicosis or asbestosis until 1997. Therefore, we
disagree with U.S. Silica's contention that Youngblood's summary judgment affidavit is
merely a sham that cannot be considered as substantive evidence.
Â Â Â Â Â Â Â Â Â Â Yet even if we were to conclude there were subtle differences between
Youngblood's deposition and his affidavit, we could not say those differences were so
egregious that the affidavit should be disregarded. See Shaw v. Maddox Metal Works,
Inc., 73 S.W.3d 472, 478 (Tex. App.âDallas 2002, no pet.). Instead, any such
inconsistencies or conflicts are such that they would create a fact issue that should be
resolved by a jury. Larson v. Family Violence & Sexual Assault Prevention Ctr., 64 S.W.3d
506, 513 (Tex. App.âCorpus Christi 2001, pet. denied) (finding trial court abused
discretion if it excluded affidavit based on any alleged conflicts between affidavit and
appellant's deposition).
Â Â Â Â Â Â Â Â Â Â Accordingly, we will consider the Youngbloods' affidavits in our review of the
evidence to determine whether the trial court erred by granting summary judgment in favor
of U.S. Silica. Cf., Peerenboom v. HSP Foods, Inc., 910 S.W.2d 156, 160-61 (Tex.
App.âWaco 1995, no pet.).
B. Granting Summary Judgment
Â Â Â Â Â Â Â Â Â Â "Typically, inquiries involving the discovery rule raise questions to be decided by the
trier of fact, although the trial court may determine the commencement of limitations as a
matter of law if reasonable minds could not differ about the conclusion to be drawn from
the facts set forth in the record." Nugent, 30 S.W.3d at 567. In this case, the medical
reports included differential diagnoses of silicosis and tuberculosis (or various other
diseases) as early as 1992. The 1992â1996 medical records, however, do not affirmatively
indicate Youngblood was ever made aware of these differential diagnoses. For example,
Youngblood reported shortness of breath beginning in the late 1980s and early 1990s, with
subsequent onset of prolonged coughing in the 1990s. One doctor told Youngblood his
condition was probably the result of smoking cigarettes. Youngblood received news of
abnormal x-rays in 1992 from Goldstein (a company physician) and from Stockman
(Youngblood's personal physician). According to Youngblood, however, Stockman found
no evidence of silicotic material, silicosis, or tuberculosis. It was not until he met with
Petroff December 5, 1997, that anyone told Youngblood he had silicosis. 
Â Â Â Â Â Â Â Â Â Â From 1992 until 1997, the doctors hired by Kilgore Ceramics made repeated
suggestions, in writing, that Youngblood visit his personal physician regarding the abnormal
x-rays. The medical records admitted into evidence show Youngblood usually visited a
doctor within two or three months of receiving those letters. We believe Youngblood's
pattern of visiting his personal physician soon after receiving letters from company
physicians shows Youngblood was exercising due diligence in trying to find the cause of
his abnormal x-rays. Yet despite these timely doctor visits, Youngblood consistently stated
no one could explain the cause of the breathing difficulties. According to Youngblood, no
doctor formally diagnosed him with silicosis until December 1997. There was no evidence
that a 1995 unsigned recommendation from Erwin to Surya Lanka, M.D., was either
conveyed to Youngblood or acted on by Lanka. Thus, assuming Youngblood's testimony
is believable (as we must in reviewing a grant of summary judgment, in which all evidence
is viewed in the light most favorable to the nonmovant), this is not a case where the plaintiff
failed to exercise due diligence or otherwise had sufficient information that he should have
concluded his shortness of breath was related to inhalation of silica.



Â Â Â Â Â Â Â Â Â Â The chief contradictory evidence comes from Stockman's 2002 affidavit (made ten
years after she met with Youngblood) and anecdotal evidence suggesting Youngblood
could have concluded his respiratory difficulties were related to breathing silica for more
than forty years during his employment at Kilgore Ceramics (especially when the plant
ordered periodic chest x-rays and made employees wear protective masks). But viewing
the evidence in the light most favorable to Youngblood, there is more than a scintilla of
evidence suggesting Youngblood neither discovered his disease, nor could he have
assumed he had a work-related illness,


 until so informed DecemberÂ 5, 1997. We
therefore find the trial court erred by granting summary judgment in this case.
Â Â Â Â Â Â Â Â Â Â This holding is consistent with the Texas Supreme Court's expressed policy of not
requiring plaintiffs to file suit "based only upon their suspicions about causal connections." 
Childs, 974 S.W.2d at 43. And our decision is consistent with the Texas Supreme Court's
proclamation that the commencement of the statute of limitations cannot be determined
as a matter of law if reasonable minds could differ about the conclusion to be drawn from
the facts in the record. Id. at 44â46. 
Conclusion
Â Â Â Â Â Â Â Â Â Â For the reasons stated, we find, when viewing the evidence in the light most
favorable to Youngblood, there is more than a scintilla of evidence Youngblood used due
diligence in determining the cause of his respiratory difficulties, but despite such efforts
neither knew nor could have known his illness was work related until December 5, 1997. 
Â Â Â Â Â Â Â Â Â Â We reverse the trial court's judgment and remand the case for further proceedings.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Donald R. Ross
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice


Date Submitted:Â Â Â Â Â Â November 12, 2003
Date Decided:Â Â Â Â Â Â Â Â Â March 17, 2004



='mso-tab-count:1'>   That Road No. 1 and Road No. 3 are
easements for the use and benefit of all parties to the suit, and not for the
exclusive use of any party.Â  The Trahans were
ordered to remove all fences and gates erected by them from any part of those
easements. 

Â Â Â Â Â Â Â Â Â Â Â  (c)Â Â Â Â Â Â Â  That there is no easement for the
benefit of any person existing as to Road No. 2.

Â Â Â Â Â Â Â Â Â Â Â  (d)Â Â Â Â Â Â  That Road No. 4 (which provides access
from the north line of the tract owned by Choate to Road No. 1) is a private
easement for the use and benefit of the owner of the Choate property.Â  The Trahans were ordered to remove the gate
which blocked Road No. 4, but were permitted to construct another gate at the
terminus of Road No. 4 with the north line of the Choate property so long as
Choate was given the right to travel through the gate.[3]Â  

Â Â Â Â Â Â Â Â Â Â Â  (e)Â Â Â Â Â Â Â  The descriptions of the easements shown
as Road No. 1 and Road No. 4 were amended to more closely conform to the use on
the ground. 

Â Â Â Â Â Â Â Â Â Â Â  On
appeal, the Lambrights contend that the trial court erred in refusing to find
the three of the roadways at issue to be public roads (acquiescing in the
finding that Road No. 2 was not a public roadway).Â  The Trahans filed a cross-appeal, alleging
nine points of error, which are grouped as follows:Â  (1) the trial court erred in finding, both in
the final judgment and in conclusion of law number 8[4]
(i.e., that Road No. 1 was declared to be forty feet wide); (2) the trial court
erred in finding that the portion of Road No. 1, which is situated east of the
intersection of Road No. 1 and Road No. 3 has been used by the parties; (3)
there is no evidence to support the trial courtÂs finding that Choate and his
family have, Âover the years,Â used Road No. 4 for access to their property
from Road No. 1, and such finding is against the great weight and preponderance
of the evidence; (4) there is no evidence to support the courtÂs finding that
the roadway used by Choate and his family has a width of forty feet, and such
finding is against the great weight and preponderance of the evidence; (5)
there is no evidence to support the trial courtÂs conclusion of law[5]
purporting to recognize a forty-foot easement to the Choate property along Road
No. 4; and (6) the trial court erred in ordering Trahan to move gates and
fences which deny access to the Choate property via Road No. 4.[6]Â  Significantly, neither of the parties
challenged the authority of the trial court to relocate the roads described in
the express grant to more closely conform with the location of the roadbeds on
the ground. 

Â Â Â Â Â Â Â Â Â Â Â  For
all practical purposes, the trial court determined that all of the easements
set out in the express grant (except for Road No. 2) were (and remained)
private easements for the use and benefit of all of the litigants, their heirs
and assigns, but, because there had been no acceptance of a dedication by the
public, these were not public roads. Â The
trial court further concluded that with the exception of Road No. 4, the
easements as determined could not be blocked by any gate and enjoined their
blockage. 

II.Â Â Â Â Â Â Â  ANALYSIS

Â Â Â Â Â Â Â Â Â Â Â  A.Â Â Â Â Â Â Â  Are the Roadways in Question Public
Roads?

Â Â Â Â Â Â Â Â Â Â Â  The
trial court concluded that Â[t]he roadways described in the conveyance are not
road easements dedicated to use by the public.ÂÂ 
In their sole point of error, the Lambrights contend that the trial
court erred in so concluding.Â  The
relevant issue is whether a dedication of the roads to public use was fully
accomplished; the resolution of this issue rests on the existence of the facts
underlying this conclusion.Â  In arriving
at this conclusion, the trial court found that Â[t]here is no evidence that the
parties or the public accepted the roads referred to in the conveyance.Â Â See
Viscardi v. Pajestka, 576 S.W.2d 16, 19 (Tex. 1978) (whether public right
of way has been acquired by dedication is generally question of fact).Â  

Â Â Â Â Â Â Â Â Â Â Â  Findings
of fact entered in a case tried to the bench Âare of the same force and dignity
as a juryÂs answers to jury questions.ÂÂ 
.39 Acres v. State, 247 S.W.3d
384, 387 (Tex. App.ÂTexarkana 2008, pet. denied) (citing Anderson v. City of Seven Points, 806 S.W.2d 791, 794 (Tex.
1991)).Â  We review the findings of fact
by the same standards that are applied in reviewing the legal or factual
sufficiency of the evidence supporting a juryÂs answer to a jury question.Â  Id.
(citing Ortiz v. Jones, 917 S.W.2d
770, 772 (Tex. 1996); Catalina v. Blasdel,
881 S.W.2d 295, 297 (Tex. 1994)).

Â Â Â Â Â Â Â Â Â Â Â  The
test for legal sufficiency is Âwhether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review.ÂÂ  City of
Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).Â  We will credit evidence favorable to the
finding of the court if a reasonable judge acting as a fact-finder could, and
will disregard contrary evidence unless a reasonable judge could not when
making this determination.Â  Id.; Ramsay
v. Tex. Trading Co., 254 S.W.3d 620, 625 (Tex. App.ÂTexarkana 2008, pet.
denied).Â  As long as the evidence falls
within the zone of reasonable disagreement, we will not substitute our judgment
for the judgment of the trial court.Â  Ramsay, 254 S.W.3d at 625 (citing Wilson, 168 S.W.3d at 822).Â  In this case, the court is the sole judge of
the credibility of the witnesses and weight given to their testimony.Â  Id.
(citing Wilson, 168 S.W.3d at
819).Â  Although we consider the evidence
in a light most favorable to the challenged findings, indulging every
reasonable inference that supports them, we may not disregard evidence that
allows only one inference.Â  Id.

Â Â Â Â Â Â Â Â Â Â Â  When
considering a factual sufficiency challenge to a juryÂs verdict, we must
consider and weigh all of the evidence, not just that evidence which supports
the trial courtÂs judgment.Â  Id.Â 
We will set aside the judgment only if it is so contrary to the
overwhelming weight of the evidence that it is clearly wrong and unjust.Â  Mar.
Overseas Corp. v. Ellis, 971
S.W.2d 402, 406Â07 (Tex. 1998).Â  Because
we are not a fact-finder, we will not pass on the witnessesÂ credibility or
substitute our judgment for the judgeÂs, even if the evidence would clearly
support a different result.Â  Id. at 407.

Â Â Â Â Â Â Â Â Â Â Â  We
find it helpful to clarify the description of the four roads at issue.Â  The plat depicting these roads (PlaintiffÂs
Exhibit No. 11) shows a Âgreen roadÂ and a Âred roadÂ (these being called by
those names because the drafter of the plat used green ink to portray the road
location of the roadbeds in existence and red ink to portray the location of
the four roads described by metes and bounds in the express grant). Â For the most part, the green road falls within
the boundaries of the red road on the plat.Â 


Â Â Â Â Â Â Â Â Â Â Â  The
road leading into the property from Old Farm to Market Road 705 is depicted on
the plat as ÂRoad No. 1.ÂÂ  As shown in
red, this road (as described in the express grant) has a width of forty
feet.Â  Much of the area contained in the
easements shown in red are overgrown and have not been cleared of trees and
underbrush.Â  As shown drawn in green
(i.e., as it currently exists on the ground), Road No. 1 appears to be a narrow
road.[7]Â  The Trahans fenced portions of Road No. 1
and, as a result, this road was, in some places, narrowed even more than the
previously-established roadbeds.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
Lambrights stipulated at trial that Road No. 2 is not a public road and made no
claim to easement rights upon it.

Â Â Â Â Â Â Â Â Â Â Â  Road
No. 3, as depicted in both red and green, is twenty feet in width.Â  This dirt road provides access to the
property owners whose tracts abut the Sam Rayburn Reservoir. Â The location of this road as called for in the
express grant differs from the use of the road as reflected on the plat; the
actual use parallels the called location, but is situated east of and abutting
the location described in the express grant. 

Â Â Â Â Â Â Â Â Â Â Â  Road
No. 4 is depicted only as a Âred roadÂ in the plat.Â  However, this short road segment leading from
Road No. 1 to the Choate property was found by the court to have been used for
the past thirty years.Â  As depicted on
the plat, Road No. 4 as described in the express grant is forty feet wide.Â  The Trahans installed a gate across this
road, thus denying the Choates access to their property along Road No. 4.Â  The Trahans also placed a fence approximately
one foot in front of the ChoatesÂ chicken house. Â At the time of trial, although the east line
of the Choate property abuts Road No. 3 (thereby providing access to the Choate
property from that direction), there was no access to the north line of the
Choate property by using Road No. 4 because that had been blocked by the
TrahansÂ fence.Â  

Â Â Â Â Â Â Â Â Â Â Â  Finally,
the eastern end of Road No. 1, lying east of its intersection with Road No. 3
(depicted only as a Âred roadÂ on the plat), provides access to the Sam Rayburn
Reservoir.Â  The Trahans installed a gate
across this section of the road.Â Â Â  

Â Â Â Â Â Â Â Â Â Â Â  The
Lambrights contend that because the evidence established that the roadways in
question[8]
were subject to an express dedication to the Âgeneral publicÂ in the express
grant and because the roadways were accepted and used by the public, the trial
court erred in concluding that Road No. 1, Road No. 3, and Road No. 4 were only
private road easements rather than public roads.[9]Â  

Â Â Â Â Â Â Â Â Â Â Â  Dedication
of a roadway may occur as a result of either an express grant or dedication or
by implication.Â  Pinebrook Props., Ltd. v. Brookhaven Lake Prop. Owners AssÂn, 77
S.W.3d 487, 503 (Tex. App.ÂÂTexarkana 2002, pet. denied); Gutierrez v. County of Zapata, 951 S.W.2d 831, 837Â38 (Tex. App.ÂÂSan
Antonio 1997, no writ).Â  Generally, an
express dedication is accomplished by deed or written instrument.Â  Broussard
v. Jablecki, 792 S.W.2d 535, 537 (Tex. App.ÂÂHouston [1st Dist.] 1990, no
writ).Â  The case at bar involves just
such an express dedication, as evidenced by the conveyance of the right of
passage on and across four roadways; under the terms of the express grant, this
right was not given solely to the grantees in the instrument, but also to the
general public.Â  

Â Â Â Â Â Â Â Â Â Â Â  The
question before us is not, therefore, whether a dedication of the roadways in
question was tendered by the express grant but, rather, whether there was an
acceptance by the public of that tender.Â 
In order to complete the creation of a public easement by an express
dedication of property, as here, there must be acceptance of the dedication by or
on behalf of the public.Â  See Maddox v. Maxwell, 369 S.W.2d 343,
347 (Tex. 1963); Gutierrez, 951
S.W.2d at 838.Â  In the seminal case of Viscardi, the Texas Supreme Court noted
that the courts of this State do not require a formal or express acceptance of
a dedication by the public; rather, Â[a]n implied acceptance by the public is
sufficient.Â Â Viscardi, 576 S.W.2d at 19.Â 
That is, by general and customary use, the public can accept a
dedication.Â  Id.

Â Â Â Â Â Â Â Â Â Â Â  It
is undisputed that San Augustine County has never provided any maintenance for
any part of any of the roadways at issue.Â 
Rather, the property owners who use the roads have maintained those
roads.Â  Trahan testified that San Augustine
County never recognized or accepted these roads as public easements and there
was no proffer of any evidence of a formal acceptance of the dedication by the
San Augustine County CommissionersÂ Court.Â 
Judy Kay Burris (daughter of and attorney in fact for Choate) testified
that the Âgeneral publicÂ used the road that comes off of Old Farm to Market
Road 705[10]
and that the use of Road No. 1 is not limited solely to people who own the
property serviced by the road.Â  Foote
testified that there has been Âa lot of trafficÂ coming in on Road No. 1.Â  Lambright testified that the Âgeneral publicÂ
uses Road No. 3 as well.[11]
Road No. 3 has been used by census takers, ambulance drivers, and police.Â  (One observes from the plat that in order for
such persons to use Road No. 3, they must first travel Road No. 1 to get to
it.) Â Further, Lambright has Âseen peopleÂ
using the road that goes to the ChoatesÂ property.[12] 

Â Â Â Â Â Â Â Â Â Â Â  The
courts of this State have held for a very long time that the acceptance by the
public need not be express; rather, an implied acceptance by the public is
sufficient. Â Gilder v. City of Brenham, 67 Tex. 345, 3 S.W. 309 (1887).Â  Public roadways can be created by both
express and implied dedication of the land to public use. Â Jezek v.
City of Midland, 605 S.W.2d 544, 548Â49 (Tex. 1980). Â The evidence here in support of the proposition
that these roadways have been accepted by the public is generally limited to
rather vague testimony that they are used by the Âgeneral public,Â including
census takers, ambulance drivers, and police.Â 
In fact, Road No. 1 is marked with a Âprivate roadÂ sign at its western
terminus (i.e., its entrance from the public roadway system).Â  The formal acceptance of the dedication of a
roadway by a governmental entity is relatively easy to determine because it is
done by action of that governmental entity and monumented by such things as
minutes of meetings.Â  Acceptance by
public use has no such bright line determinative act.Â  The required use of a roadway by the public
need not be for any specific length of time and a short period of use generally
is sufficient, so long as the use continues for such a period that it may be
inferred that the public desires to accept in perpetuity the offer of use. Â See Stein v. Killough, 53 S.W.3d 36, 42 n.2
(Tex. App.ÂÂSan Antonio 2001, no pet.); Schwertner
v. Jones, 456 S.W.2d 956, 959 (Tex. Civ. App.ÂÂAustin 1970, no writ); City of Dallas v. Schawe, 12 S.W.2d
1074, 1076 (Tex. Civ. App.ÂÂSan Antonio 1928, writ dismÂd).Â  

Â Â Â Â Â Â Â Â Â Â Â  One
notes that the use of a roadway by law enforcement officers, ambulance drivers,
and census takers is not conclusive as to the intent of those members of the
public to accept a dedication of a roadway as a public roadway.Â  In similar fashion, such officials might use
a hallway in an apartment building for access to an apartment within it without
any thought that the hallways have been dedicated to public use.Â  The trier of fact must infer the intent of
the members of the public from its actions.Â 
Apparently, the trial court here did not infer that the publicÂs use of
these roads in these circumstances as described by the evidence sufficiently
showed the intention of the public to accept them as public roads. Â Given the paucity of evidence on the issue of
public acceptance and the fact that the burden to prove their acceptance lay
with the proponents, we believe a Âreasonable and fair-mindedÂ fact-finder
could conclude that the proof of acceptance of the roadways by public use
failed to meet the required burden.Â  See Wilson, 168 S.W.3d at 827. We
further conclude that the judgment is not so contrary to the overwhelming
weight of the evidence that it is clearly wrong and unjust.Â  Ramsay,
254 S.W.3d at 625.Â  

Â Â Â Â Â Â Â Â Â Â Â  We
overrule this point of error.Â  

B.Â Â Â Â Â Â Â  The
Trial Court Did Not Err in Finding the Width of Road No. 1 and Road No. 4 to Each
be Forty Feet or in No Finding of Abandonment.

Â 

Â Â Â Â Â Â Â Â Â Â Â  On
cross-appeal, a great portion of the complaints raised by the Trahans center
upon the actual usage of the roadways contained in the express conveyance.Â  They dispute the finding of the trial court
that the width of Road No. 1 and Road No. 4 to be forty feet, contend that
there has been no use of the portion of Road No. 1 which extends easterly from
the intersection of Road No.Â 1 and Road No. 3 to Sam Rayburn Reservoir,
and maintain that the courtÂs finding that the Choate family has used Road No.
4 Âover the yearsÂ is not supported by the evidence.Â  Apparently, these arguments are intended to
buttress their contention that by using only a part of the easements and not
their full length and width, the proponents of the easements have effectively
abandoned the portions not used. Â However,
it has long been a 

universally recognized rule that, while
abandonment may be established, like any other fact, by circumstances, yet
those circumstances must disclose some definite act showing an intention to
abandon and terminate the right possessed by the easement owner. Â The material question is the intention to
abandon, and that intention must be established by clear and satisfactory
evidence. Â Mere nonuser of an easement
will not extinguish it. 

Â 

Dallas County v. Miller, 140 Tex. 242, 245, 166 S.W.2d 922, 924Â25 (1942).Â  The intent to abandon an easement Âmust be
established by clear and satisfactory evidence.Â Â Milligan
v. Niebuhr, 990 S.W.2d 823, 826 (Tex. App.ÂÂAustin 1999, no pet.).Â  As with any other affirmative plea, the
burden of showing abandonment of the rights in the easement rested on the
Trahans.Â  Other than showing that the
actual roadbed on Road No. 1 was only some twenty feet in width and that a
portion of Road No. 1 had not been cleared at all, they provided no evidence of
an intent to abandon any part of any of the roads described in the express
grant. Â As a practical matter, there is
ample evidence of use of at least parts of each of Road Nos. 1, 3, and 4 to
sustain the judgment of the trial court. 

Â Â Â Â Â Â Â Â Â Â Â  Further,
Â[i]t is well settled that the rules which control the courts in the
construction of easements are, in general, the same as those applied to the
construction of deeds and other written instruments.ÂÂ  Stephenson
v. Vastar Res., Inc., 89 S.W.3d
790, 792 (Tex. App.ÂÂCorpus Christi 2002, pet. denied); Knox v. Pioneer Natural Gas Co., 321 S.W.2d 596, 602 (Tex. Civ.
App.ÂÂElÂ Paso 1959, writ refÂd n.r.e.).Â 
The express grant described the width and breadth of the easements upon
which the Lambrights relied and the Lambrights used at least a portion of each
of Road Nos. 1, 3, and 4 as access to their respective tracts without
interruption (until the Trahans fenced off Road No. 4 in its entirety).Â  Accordingly, they were in possession of the
easement rights conveyed under the express grant.Â  A person in possession of a portion of lands
conveyed to him is considered in law to have had constructive possession of all
the land embraced within the description of his property as described in the
registered deed under which he claims, although he was in actual possession of
only a part of the lot described. Â Hunt Oil Co. v. Moore, 656 S.W.2d 634,
641 (Tex. App.ÂÂTyler 1983, writ refÂd n.r.e.); Love v. McGee, 378 S.W.2d 96, 98 (Tex. Civ. App.ÂÂTexarkana 1964, writ
refÂd n.r.e.).Â  Under the constructive
possession doctrine, therefore, the Lambrights remained in possession of every
part of all of the four roads described in the express grant. 

Â Â Â Â Â Â Â Â Â Â Â  On
appeal, a trial courtÂs conclusions of law are reviewed de novo and will be
reversed only if they are erroneous as a matter of law. Â Villagomez
v. Rockwood Specialties, Inc., 210 S.W.3d 720, 727Â28 (Tex. App.ÂÂCorpus
Christi 2006, pet. denied).Â  We will
uphold the trial courtÂs conclusions upon any legal theory supported by the
evidence.Â  BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 794 (Tex.
2002).Â  Those conclusions cannot be
challenged for factual insufficiency; however, we may review the trial courtÂs
legal conclusions drawn from the facts to determine their correctness.Â  See id.

Â Â Â Â Â Â Â Â Â Â Â  The
Trahans claim that all of the evidence showed the roads used since 1976 have
never been wider than twenty feet. Â Even
if that is true, it is not determinative of the issue here.Â  The portion of the granted easement which was
actually put to use does not dictate the width of the easement; the granted
easement does.

Â Â Â Â Â Â Â Â Â Â Â  We
overrule this cross-point of error.

Â Â Â Â Â Â Â Â Â Â Â  C.Â Â Â Â Â Â Â  The
Trial Court Appropriately Ordered the Removal of Gates.

Â Â Â Â Â Â Â Â Â Â Â  The
Trahans complain that there is no evidence to support a finding or ruling that
they are required to remove gates and fences from any of the easements which
were found to exist on any of the roadways.Â 


Â Â Â Â Â Â Â Â Â Â Â  In
so doing, the Trahans continue to ignore the express grant which was the
genesis of the rights upon which the Lambrights rely.Â  That conveyance specifically conveys the
grantees Âthe free and uninterrupted use, liberty, privilege and easement of
passing alongÂ the roads described therein as Road Nos. 1, 2, 3, and 4.Â  (Note that the Lambrights did not contest the
TrahansÂ contention that there was no easement over Road No. 2 and the trial
court found none.)Â  When traveling on the
roads, a gate is an interruption which hinders the free passage along those roads.Â  There is no merit in the claim that this
prohibition against gates finds no basis in the evidence.

Â Â Â Â Â Â Â Â Â Â Â  We
overrule this point of error.

Â Â Â Â Â Â Â Â Â Â Â  D.Â Â Â Â Â Â Â  Another Means of Access for Choate Does
Not Negate Express Grant. 

Â Â Â Â Â Â Â Â Â Â Â  The Trahans further argue that since
there is access to the Choate property via Road No. 3, the court should not
have determined that they should also have access via Road No. 4, contending
further that Road No. 4 was now seldom, if ever, used.

Â Â Â Â Â Â Â Â Â Â Â  In
order to establish an implied easement by necessity, a party must establish (1)
unity of ownership of the dominant and servient estates prior to severance, (2)
the necessity of a roadway, and (3) that the necessity existed at the time the
estates were severed. Â Daniel v. Fox, 917 S.W.2d 106, 111 (Tex.
App.ÂÂSan Antonio 1996, writ denied).Â 
The way of necessity must be more than one of convenience; in other
words, if the owner of the land can use another way, he cannot claim by
implication to pass over land of another to get to his own. Â Duff v.
Matthews, 158 Tex. 333, 311 S.W.2d 637, 640 (1958).

Â Â Â Â Â Â Â Â Â Â Â  This
doctrine of implied easement by necessity must have been the guiding star for
the pleading that Road No. 4 should be dissolved because the Choate property
abuts another roadway.Â  However, it is
not a valid argument because the easement rights belonging to Choate do not
arise by way of necessity but, rather, by the express grant.Â  The two means of access to the Choate
property existed when the Choate property was carved from the same tract now
owned by the Trahans.Â  The existence of
another means of access to the Choate property and the frequency of the use of
Road No. 4 as access to the Choate property are just simply not relevant to the
findings and orders made by the trial court pertaining to Road No. 4.Â  We do not reiterate the previous discussion
of abandonment of the easement.

Â Â Â Â Â Â Â Â Â Â Â  We
overrule these points of error.

III.Â Â Â Â Â Â  CONCLUSION

Â Â Â Â Â Â Â Â Â Â Â  We
affirm the judgment of the trial court.

Â 

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Bailey
C. Moseley

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â  Justice

Â 

Date Submitted:Â Â Â Â Â Â Â Â Â  August 2, 2010

Date Decided:Â Â Â Â Â Â Â Â Â Â Â Â  September 2, 2010

Â 











[1]Originally
appealed to the Twelfth Court of Appeals, this case was transferred to this
Court by the Texas Supreme Court pursuant to its docket equalization
efforts.Â  See Tex. GovÂt Code Ann. Â§ 73.001 (Vernon
2005).Â  We are unaware of any conflict
between precedent of the Twelfth Court of Appeals and that of this Court on any
relevant issue.Â  See Tex. R. App. P. 41.3.

Â 





[2]After
this appeal was perfected, a suggestion of the death of Ardly J. Choate was
received by this Court with a request that the case proceed with Judy K.
Burris, Independent Executrix of the Estate of Ardly Joseph Choate, deceased,
substituted in his stead.Â  Pursuant to
Rule 7.1(a)(1), Texas Rules of Appellate Procedure, this case will continue to
proceed in the name of Ardly J. Choate.Â  Tex. R. App. P. 7.1(a)(1). 





[3]As
noted previously, the judgment contains no descriptions of any of the road
easements other than by reference to PlaintiffÂs Exhibit No. 11. 





[4]Conclusion
of law number 8 states that Â[t]he dirt road purporting to be Road No. 1 on
PlaintiffÂs Exhibit 8 is declared to be 40Â in width with the northern boundary
of said road to coincide with the northern boundary of the Âgreen roadÂ and to
extend southerly for a uniform width of twenty feet (40Â) [sic].Â

Â 





[5]Conclusion
of law number 10 states that Â[t]he roadway easement to the Ardley [sic] J.
Choate property, purporting to be Road No. 4 on the conveyance, is recognized
as a roadway easement and shall be forty feet (40Â) in width centered on the
center line of the most northerly chicken house on the Choate property as shown
on PlaintiffÂs Exhibit No. 11.Â

Â 





[6]Conclusion
of law number 13 states that ÂDefendants should be ordered to remove, at their
sole expense, the gate and fence which restricts the access of Ardly J. Choate
and his family to their property by passage on what has been identified in the
conveyance as Road No. 4.Â

Â  





[7]The
record does not clearly state the width of this road.Â  The plat indicates that Road No. 1 (green
version) is not forty feet wide.Â 
However, Trahan indicated that he intended to narrow the easement to
twenty feet.Â  In some areas, the fences
were placed four to five feet into the existing road.Â  





[8]The
Lambrights stipulated at trial that there was no evidence of use by the public
of Road No. 2.Â  Therefore, the Lambrights
contend on appeal that only Road No. 1, Road No. 3, and Road No. 4 were public
roads. Â 

Â 





[9]No
party contends that Road No. 2 is a public road.





[10]Described
as ÂRoad No. 1Â on the plat of the subject property.Â  

Â 





[11]Described
as ÂRoad No. 3Â on the plat of the subject property.Â  

Â 





[12]Described
as ÂRoad No. 4Â on the plat of the subject property.Â